IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN IMMIGRATION COUNCIL
1331 G Street NW #200
Washington, DC 20005,

NEW YORK IMMIGRATION COALITION
131 West 33rd Street
New York, NY 10001,

NORTHWEST IMMIGRANT RIGHTS
PROJECT
615 2nd Avenue S, #400
Seattle, WA 98104,

ONEAMERICA
1225 S Weller Street, #430
Seattle, WA 98144,

MICHIGAN ORGANIZING PROJECT
4405 Wesson Street
Detroit, MI 48210, and

MIGRANT JUSTICE
294 N Winooski Avenue
Burlington, VT 05401,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY
Washington, D.C. 20528, and

UNITED STATES CUSTOMS AND
BORDER PROTECTION
1300 Pennsylvania Avenue NW
Washington, DC 20229

        Defendants.

Civil Action No. _____

**<u>COMPLAINT</u>**

1

Plaintiffs American Immigration Council ("Council"), New York Immigration Coalition ("NYIC"), Northwest Immigrant Rights Project ("NWIRP"), OneAmerica, Michigan Organizing Project, and Migrant Justice, by and through their undersigned attorneys, in support of this Complaint against Defendants United States Department of Homeland Security ("DHS") and United States Customs and Border Protection ("CBP"), allege as follows:

## I. SUMMARY AND NATURE OF THE CASE

1.      This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking disclosure of records concerning (i) the use of CBP personnel to provide interpretation and/or translation services to local, state, or other federal law enforcement agencies, and (ii) the participation of CBP personnel in 911 dispatch activities.  Plaintiffs seek declaratory, injunctive, and other appropriate relief with respect to Defendants' unlawful withholding of these records.

### A.      CBP Involvement in Domestic Law Enforcement

2.      Plaintiffs' FOIA requests relate to a CBP policy or practice permitting U.S. Border Patrol ("USBP") agents to participate in domestic law enforcement and the provision of emergency services.  Prior to November 2012, USBP agents near the U.S.-Canada border regularly provided interpretation services to other law enforcement agencies.  Capitalizing on their access to members of immigrant communities, USBP agents often injected immigration enforcement activities into otherwise routine interactions between law enforcement officials and non-English speakers.  During this time, USBP agents also periodically responded to 911 emergency assistance calls, particularly when the caller was perceived not to speak English.

3.      The harmful effects of allowing USBP agents to participate in domestic law enforcement has been well-documented.  For example, on May 31, 2012, the Department of Agriculture's Office of the Assistant Secretary for Civil Rights ("OASCR") found that the U.S.

2

Forest Service ("USFS") had discriminated against Latinos in Washington State when it used USBP agents to provide interpretation services and law enforcement support. OASCR found that the USFS policy was "discriminatory on its face, and not solely in the circumstances of this case." Agric. Dec., FS-11-5171, 29 (Apr. 28, 2012) (Ex. A). OASCR further found that CBP's involvement in providing interpretation services denied Latinos "meaningful access" to government services because the increased likelihood of immigration scrutiny for Latinos discourages Latinos from using USFS's services and may cause harm or humiliation. *Id.*, at 24.

4.      Reports by non-governmental organizations ("NGOs") have reached the same conclusions as OASCR. For example, a report published by the American Immigration Council concluded that "[i]nvolving USBP in local law enforcement matters breeds distrust between communities and the officers whose job is to serve and protect them." Lisa Graybill, *Border Patrol Agents as Interpreters Along the Northern Border: Unwise Policy, Illegal Practice*, American Immigration Council, Sept. 2012, at 6 (Ex. B). That report found that USBP's involvement in domestic law enforcement matters caused community members to avoid calling the police when they otherwise would have, and that this "is true both for undocumented immigrants and for citizens . . ." *Id.* Finally, USBP's involvement in domestic law enforcement matters also had "negative implications for public health and safety: it makes it harder for officers to investigate crimes, reduces the likelihood individuals in dangerous situations will seek police assistance, and increases the likelihood that crimes, including violent crimes, will go unreported or unsolved." *Id.*

5.      Additionally, the police chiefs of a number of major U.S. cities have stated:

Without assurances that contact with the police would not result in purely civil immigration enforcement action, the hard won trust, communication and cooperation from the immigrant community would disappear. Such a divide between the local police and immigrant groups would result in increased crime against immigrants and in the

broader community, create a class of silent victims and eliminate the potential for assistance from immigrants in solving crimes or preventing future terroristic acts.

*See* Major Cities Chiefs Association, M.C.C. Immigration Committee Recommendations For Enforcement of Immigration Laws by Local Police Agencies (position paper, June 2006) (Ex. C). For these reasons, many local law enforcement agencies nationwide have established policies prohibiting their officers from participating in immigration enforcement.

6.     In the wake of administrative complaints and the overwhelming evidence of the negative effects of injecting CBP personnel into domestic law enforcement, on November 21, 2012, CBP Deputy Commissioner David Aguilar implemented a policy limiting the circumstances under which CBP's officers, including USBP agents, could act as interpreters for other law enforcement agencies. Deputy Commissioner Aguilar's new policy recognized that CBP's prior practice of allowing participation by USBP agents in routine law enforcement and emergency assistance matters was discriminatory and unlawful, cultivating a culture of distrust between local law enforcement and immigrant communities and denying those immigrant communities meaningful access to government services.

7.     Despite the clear evidence of the negative effects of USBP's involvement in domestic law enforcement, on June 20, 2016, CBP Commissioner R. Gil Kerlikowske announced his intention to rescind Deputy Commissioner Aguilar's 2012 policy that limited CBP's ability to provide interpretation services to other law enforcement agencies. This proposed policy reversal, again allowing USBP agents to inject themselves into domestic law enforcement matters, is certain to give rise to the same negative consequences that occurred prior to Deputy Commissioner Aguilar's much-lauded 2012 policy. Accordingly, Commissioner Kerlikowske's threatened policy change provoked over 150 NGOs to write a letter outlining the harmful effects of Commissioner Kerlikowske's regressive policy and urging CBP to reconsider its decision.

8.      More recently, President Trump issued an Executive Order entitled encouraging increased commingling between federal immigration functions and local law enforcement and prompting widespread concern of discrimination by NGOs.  *See* "Executive Order: Enhancing Public Safety in the Interior of the United States (Ex. D).

## B.      Plaintiffs' FOIA Requests

9.      Almost five years ago, Plaintiffs requested records in Defendants' possession related to CBP's provision of interpretation services to other law enforcement agencies and its involvement in 911 dispatch responses.  The records sought by Plaintiffs would, among other things, help the public understand the government's rationale for, as well as the effects of, CBP's policy allowing USBP agents to provide interpretation services to other law enforcement agencies.

10.     Plaintiffs filed their initial FOIA requests on May 31, 2012.  To date, Defendants have collectively produced approximately 1,700 pages of documents, a substantial number of which are heavily redacted and appear to be overly redacted.

11.     Plaintiffs believe Defendants have failed to identify and turn over all records responsive to their requests.  DHS's own records reveal that USBP officers have provided interpretation services to local law enforcement in several states from which no documents have been produced.  *See* Mem. For Margo Schlanger, Officer Patrol for Interpretation Assistance, June 28, 2011 (Ex. E).  Defendants' failure to turn over the requested records violates the FOIA and is impeding Plaintiffs' efforts to publicly disseminate information regarding the implications of this policy.

## II. PARTIES

12.     Plaintiff American Immigration Council is a tax-exempt, not-for-profit educational and charitable organization under section 501(c)(3) of the Internal Revenue Code,

with its principal place of business at 1331 G Street, Suite 200, in Washington, D.C.  Founded in 1987, the Council works to increase public understanding of immigration law and policy, advocate for the fair and just administration of our immigration laws, protect the legal rights of noncitizens, and educate the public about the enduring contributions of America's immigrants. Through its research and analysis, the Council has become a leading resource for policymakers and opinion makers at the national, state, and local levels who seek to understand the power and potential of immigration and to develop policies that are based on facts rather than myths.  The Council also seeks, through court action and other measures, to hold the government accountable for unlawful conduct and restrictive interpretations of the law and for failing to ensure that the immigration laws are implemented and executed in a manner that comports with due process.

13.     Plaintiff NYIC is a tax-exempt, not-for-profit educational and charitable organization under section 501(c)(3) of the Internal Revenue Code, with its principal place of business at 131 W. 33rd Street, Suite 610, New York, NY 10001.  NYIC is an umbrella policy and advocacy organization for nearly 200 groups in New York State that work with immigrants and refugees.  NYIC aims to achieve a fairer and more just society that values the contributions of immigrants, extends opportunity to all by promoting immigrants' full civic participation, fosters immigrant leadership, and provides a unified voice and a vehicle for collective action for New York's diverse immigrant communities.  NYIC's multi-ethnic, multi-racial, and multi-sector membership base includes grassroots community organizations, nonprofit health and human services organizations, religious and academic institutions, labor unions, and legal, social, and economic justice organizations.  NYIC develops education materials such as brochures and fact sheets in as many as 12 languages on new developments in immigration law and policy and

provides hundreds of trainings and presentations in immigrant communities.  NYIC also works with ethnic and mainstream media to disseminate important information to immigrant families.

14.     Plaintiff Northwest Immigrant Rights Project is a tax-exempt, not-for-profit educational and charitable organization under section 501(c)(3) of the Internal Revenue Code, with its principal place of business at 615 2nd Ave, #400, Seattle, Washington 98104.  NWIRP promotes justice by defending and advancing the rights of immigrants through direct legal services, systemic advocacy, and community education.  NWIRP has previously filed complaints challenging CBP's former practice of offering Border Patrol agents as interpreters to local law enforcement officers and continues to monitor interactions between local law enforcement and CBP officials.

15.     Plaintiff OneAmerica is a tax-exempt, not-for-profit educational and charitable organization under section 501(c)(3) of the Internal Revenue Code, with its principal place of business at 1225 S. Weller Street, Suite 430, Seattle, Washington 98144.  Initially named Hate Free Zone, the organization was founded immediately after September 11, 2001 to address the backlash in a post 9/11 world against immigrant communities of color.  Since then, OneAmerica has expanded into the largest immigrant advocacy organization in Washington State, organizing in and advocating for and with a diversity of immigrant communities.  OneAmerica's mission is to advance the fundamental principles of democracy and justice through building power in immigrant communities, in collaboration with key allies.

16.     Plaintiff Michigan Organizing Project D/B/A Michigan United is a tax-exempt, not-for-profit educational and charitable organization under section 501(c)(3) with its principal place of business at 4405 Wesson Street, Detroit, Michigan 48210.  Michigan United is a statewide organization of community members and institutions fighting for the dignity and

potential of every person.  Michigan United is committed to a participatory democracy at every level, an economy that works for the many, and a society that dismantles racism while uplifting humanity.  To ignite the power of Michigan communities and shift the balance of power, Michigan United cultivates the leadership of those directly affected by injustice and builds popular institutions for the future.

17.     Plaintiff Migrant Justice is a tax-exempt, not-for-profit educational and charitable organization with its principal place of business at 294 N. Winooski Ave, Suite 130, Burlington, Vermont 05401.  Migrant Justice's mission is to build the voice, capacity, and power of the farmworker community and engage community partners to organize for economic justice and human rights.  Migrant Justice gathers the farmworker community to discuss and analyze shared problems and to envision collective solutions.  Through this ongoing investment in leadership development, members deeper their skins in community education and organizing for long-term systemic change.

18.     Defendant DHS is a Department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 552(f).  DHS is responsible for enforcing federal immigration laws.  DHS has possession and control over the records sought by Plaintiffs.

19.     Defendant CBP, a component of DHS, is an agency within the meaning of 5 U.S.C. § 552(f).  Among other duties, CBP is responsible for enforcing immigration laws at the borders and other ports of entry to the United States.  CBP inspects individuals seeking entry to the United States, including U.S. citizens, lawful permanent residents, nonimmigrants, and asylum seekers.  CBP has authority to admit or exclude individuals, issue "expedited removal" orders, make arrests, and detain noncitizens.  CBP also facilitates "voluntary returns" whereby

noncitizens in the United States give up their right to contest removal and are immediately returned to their home countries. CBP has possession and control over the records sought by Plaintiffs.

### III. JURISDICTION & VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331. This Court has jurisdiction to grant declaratory, injunctive, and further necessary or proper relief pursuant to 28 U.S.C. §§ 2201-2202 and Federal Rules of Civil Procedure 57 and 65.

21.     Venue in this district is proper under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e).

### IV. FACTUAL ALLEGATIONS

**A.     2014 Requests**

22.     On May 31, 2012, Plaintiffs submitted two FOIA requests to CBP requesting records regarding:

(i)     The actual or purported use of CBP personnel, including USBP agents, to provide interpretation and/or translation services to local, state, or other federal law enforcement agencies from January 2009 to the present (the "Translation Request," attached as Exhibit F); and

(ii)     The participation of CBP personnel, including USBP agents, in 911 dispatch activities from January 2009 to the present (the "911 Request," attached as Exhibit G).

23.     Plaintiffs identified fifteen non-exhaustive subcategories of records sought by the Translation Request, and sixteen non-exhaustive subcategories of records sought by the 911 Request.

24.     By letter dated June 7, 2012, CBP acknowledged receipt of the 911 Request.  (Ex. H.)

25.     In a letter dated July 5, 2012, CBP informed Plaintiffs that it could not locate any records responsive to eight of the fifteen subcategories set forth in the Translation Request.  (*See* Ex. I.)  In that same letter, CBP requested that Plaintiffs amend the Translation Request by limiting the types of communications sought in two of the remaining fifteen subcategories.  *Id.* CBP also claimed that it could not search for responsive email communications unless Plaintiffs provided CBP with the time frame for the search, the name or e-mail address of either the sender or the recipient, and the subject of the email.  *Id.*

26.     In response to CBP's July 5, 2012, letter regarding the Translation Request, Plaintiffs provisionally limited the scope of certain subcategories in their Translation Request to communications "involving Border Patrol stations, Border Patrol sectors, CBP field operations offices, . . . Office of Border Patrol, Office of Field Operations, and Office of Diversity and Civil Rights."  (Ex. J.)  Plaintiffs also provided specific search terms that CBP could use to identify responsive electronic communications.  *Id.*

27.     By October 2012, CBP failed to produce a single document responsive to either request, leading Plaintiffs to file an administrative appeal with respect to the 911 Request on October 12, 2012.  (*See* Ex. K.)

28.     Following Plaintiffs' October 2012 administrative appeal, CBP began producing documents responsive to both of Plaintiffs' FOIA requests.  From October 2012 through March 2013, CBP produced roughly 900 pages of responsive documents in four separate productions, but nearly all were completely or partially redacted.  (*See* Ex. L.)  The cover letters accompanying CBP's productions claimed that Plaintiffs were not yet entitled to appeal, as

CBP's production of responsive documents would be ongoing.  *Id.*  However, CBP unilaterally closed the request on April 16, 2013, with no advance notice to Plaintiffs.  Plaintiffs, however, continued to press for documents.

29.     On May 20, 2014, nearly two years after Plaintiffs initially submitted their requests, and more than a year after CBP's last production of documents, Plaintiffs requested a status update regarding their outstanding requests.  (Ex. M.)  In the interest of further easing the burden on CBP, Plaintiffs also indicated that they might be willing to again narrow the scope of the Translation Request.  *Id.*  The same day, CBP confirmed receipt of Plaintiffs' request for a status update.  (Ex. N.)

30.     Subsequent to Plaintiffs' May 20, 2014 request for a status update, Plaintiffs informed CBP by telephone that Plaintiffs were willing to narrow the scope of both the Translation Request and the 911 Request.  CBP responded by email on July 9, 2014, requesting that Plaintiffs submit the terms of their narrowed requests to CBP by email.  (Ex. O.)  Plaintiffs complied, emailing the narrowed requests to CBP on July 11, 2014.  *Id.*  CBP acknowledged receipt of Plaintiffs' narrowed requests on July 17, 2014.  (Ex. P.)

31.     Following Plaintiffs' voluntary narrowing of their requests, CBP again failed to produce documents responsive to Plaintiffs' requests.  Accordingly, in December 2014, Plaintiffs called CBP to request a further status update on both pending requests.  On December 5, 2014, CBP sent its fifth response to both requests, stating CBP had been unable to locate or identify any additional responsive documents.  (Ex. Q.)

32.     Despite CBP's purported inability to locate responsive documents, the evidence available to Plaintiffs strongly suggested that CBP is either withholding responsive documents or failed to perform an adequate search.  CBP's first four document productions consisted mainly of

reports from USBP sectors and stations in Washington State and described CBP's responses to requests from other law enforcement agencies for interpretation services and/or USBP's involvement in 911 dispatch activities.  But DHS's own records reveal that USBP officers have provided interpretation services to local law enforcement in numerous other states, including Montana, California, and Louisiana.  (*See* Ex. E.)  Additional sources show that USBP officers have also provided interpretation services in Minnesota, North Dakota, and Ohio, and have intervened in 911 dispatch activities in Vermont and New York.  (*See* Ex. B at 15-19.)  Yet Defendant's productions contained few, if any, documents from these states.

33.     Given the well-documented geographical reach of CBP's involvement in providing interpretation services and participating in 911 dispatch activities, Plaintiffs understood that CBP's first four document productions could not possibly have included all documents responsive to Plaintiffs' requests.  Nearly all of the produced documents responsive to Plaintiffs' Translation Request were limited to Washington State.  Similarly, CBP produced only a handful of records regarding its involvement in 911 dispatch activities, and every record produced related exclusively to Washington State.  CBP's failure to provide even a single record relating to interpretation services in Vermont or New York, or a single record relating to 911 dispatch activities from any state other than Washington, showed that CBP had not conducted an adequate search in response to the Plaintiffs' requests.

34.     Further evidence suggested there were additional categories of responsive records in CBP's possession that had not been produced.  For example, the City of Bellingham in Whatcom County, Washington, publicly acknowledges that "[r]esidents of the cities of Blaine, Lynden and Sumas who call 911 will be transferred to the United States Border Patrol dispatch center in Blaine."  *See* "911: Law Enforcement or Police Services" (Ex. R).  Presumably, there

are contractual agreements, reports, and/or communications between CBP and local governments related to such 911 dispatch services, but no such records were produced.  And while Plaintiffs' requests sought broad categories of records—communications, correspondence, directives, data, videotapes, audiotapes, emails, faxes, guidance, guidelines, standards, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, manuals, technical specifications, and training materials, whether written, electronic, or physical—CBP's production was conspicuously devoid of many of these types of records, including emails, for which CBP admitted it had failed to search.  (*See, e.g.* Ex. I.)

35.     Because the information available to Plaintiffs suggested that additional responsive documents remained within Defendants' possession and control and had not been produced, Plaintiffs filed an administrative appeal on February 2, 2015, relating to both of its FOIA requests, alleging that CBP did not conduct an adequate search and was in violation of its obligations under 5 U.S.C. § 552.  (Ex. S.)  Plaintiffs' appeal requested that CBP conduct an adequate search and produce all responsive, non-exempt information in its possession that was not already in the public domain.  CBP acknowledged receipt of Plaintiffs' administrative appeal on February 22, 2015.  (Ex. T.)

36.     Although statutorily obligated to respond within twenty days, 5 U.S.C. § 552(a)(6)(A)(ii), CBP did not respond to Plaintiffs' administrative appeal until September 26, 2016, over a year and a half later.  (Ex. U.)  In its response, CBP indicated that a new search had uncovered an additional 702 pages of responsive documents, only 661 of which were produced to Plaintiffs.

37.     Like the prior productions, however, those 661 pages are rife with issues.  First, nearly all of the documents produced contain some form of redaction, but the statutory

exemptions and reasons cited in support of said redactions do not support the redactions made. For example, throughout the document production, CBP cites "(b)(6) & (b)(7)(C)" over redactions that clearly do not support the cited privacy exemptions.[1]  Additionally, these same exemptions are cited for redactions that cover large blocks of text where reasonably segregable information should be released.[2]  As stated in CBP's cover letter, "the FOIA provides that any non-exempt information that is reasonably segregable from the requested records must be disclosed."  *Id.* at 8; *see also* 5 U.S.C. § 552 (b).  In most circumstances, information that qualifies for Exemptions (b)(6) and (b)(7)(C) can be segregated easily from the primary information in a block of text.  While many documents in CBP's production successfully employ such pinpointed redactions for privacy information, other documents inexplicably redact large portions of text.

38.    Additionally, CBP's September 2016 production withholds many documents in their entirety by citing the deliberative process privilege of Exemption (b)(5).  However, CBP's description of the documents it withheld pursuant to this exemption includes "documents pertaining to the implementation of CBP's translation and 911-dispatch policies."  (Ex. U at 9.) Such information is not properly withheld under the deliberative process privilege because policies that are being implemented are not, by definition, predecisional, and therefore the privilege is no longer applicable.  As this Court has explained, "deliberations about how to present an already decided policy to the public, or documents designed to explain that policy

---

[1]  Such redactions are found throughout the entire production.  Examples include pages 416-38, where the dates of reports, among other things, are inappropriately redacted; pages 386-94, where these privacy exemptions are used to redact the dates of reports as well as the "Disposition" and "File Number"; and page 112, where these exemptions are cited to justify redacting a column identified as "Nationality."

[2]  These redactions can also be found throughout the production, but examples include: page 416, where two large blocks of text are redacted for alleged privacy purposes; and page 432 where continuous language covering over half the text on the page is redacted with this justification.

to—or obscure it from—the public, including in draft form, are *at the heart of what should be released under FOIA.*" *Nat'l Day Laborer Organizing Network v. U.S. Immigration and Customs Enforcement Agency*, 811 F.Supp.2d 713, 741 (S.D.N.Y. 2011) (emphasis added); *see Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980) (holding that "an agency will not be permitted to develop a body of 'secret law,' used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege because it is not designated as 'formal,' 'binding,' or 'final.'").

39.     CBP relies on Exemption (b)(7)(E) to redact information in multiple instances that raise significant concern.  For example, the majority of the document found on page 49 of the production—a description of OA calls—is redacted.  (Ex. V at 49.)   Yet, from the unredacted text, it appears that much of what is redacted is the contents of a note from a police department thanking BPA for interpretation services.  It is unclear how Exemption (b)(7)(E) could apply in this circumstance, particularly where the nature of the incident and the location are disclosed elsewhere in the same document.  Additionally, this justification is provided for redactions where it seems there should be reasonably segregable information[3] and for redacted email subject lines.[4]

40.     In addition to the use of statutory exemptions, CBP redacts portions of documents in its production by simply—and often unjustifiably—claiming that they are not responsive.  For example, pages 15-36 include two charts with the heading "CBP – IA – 911."  (Ex. W at 15-36.)  Most of these 22 pages are redacted as "Not Responsive."   However, CBP's cover letter

---

[3]  For example, pages 114-15 appear to have three full columns redacted under Exemption (b)(7)(E).  While we do not know the subject matter contained in these columns, it seems that reasonably segregable information should exist here.

[4]  Examples may be found on pages 432 and 430.

acknowledges that the FOIA requests at issue include "records pertaining to the participation of CBP personnel … in 911 dispatch activities." (Ex. U at 4.) Based on the heading, this entire chart appears to be responsive. Likewise, pages 37-39 contain a chart titled "CBP – IA – Translation" which, other than the heading and number of pages, is entirely redacted as "Not Responsive." (Ex. X.) As acknowledged by CBP, the FOIA requests at issue include "records pertaining to the actual or purported use of CBP personnel … to provide interpretation and/or translation services." (Ex. U at 1.) As such, this too would appear – on its face – the be responsive. This issue is evident throughout the production and is not limited to these examples.[5]

41.     Finally, the sloppy nature of the production reveals that CBP is withholding documents that are both responsive and not privileged.[6] Perhaps most telling is the fact that one particular document, which appears on page 589 of CBP's production and again on page 614, contains inconsistent redactions. (*Compare* Ex. Y *with* Ex. Z.) A brief comparison of the two versions of this document shows that the redacted portion of the first copy, which appears in the second copy, is plainly responsive to plaintiffs' requests as it pertains to "a translation assistance call from a Lynden Police Officer . . . ." (Ex. Z at 2.) But-for the fact that CBP appears to have inadvertently included the same document twice in its production, Plaintiffs would not have been

---

[5]  Additional examples can be found on page 479, where a "Not Responsive" redaction obscures a single sentence in the first paragraph. The paragraph is clearly responsive and the redacted line, being in the middle of that paragraph, will at least provide context and cannot be excised as not responsive; it is responsive by its inclusion in the otherwise clearly responsive paragraph. Similarly, on page 485, although there are (at least) two responsive bullets, the entirety of the remaining document has been redacted as "Not Responsive." Thus, one cannot determine the source of the information provided or the relevant time period, as no contextual information remains.

[6]  For example:  (1) The document at page 243 references an attached memo from CBP Deputy Commissioner David V. Aguilar, titled Guidance on Providing Language Assistance to Other Law Enforcement Agencies, dated November 9, 2012, but the attached memo was not produced with this document; (2) pages 432-33 include a string of email messages, but the document begins on page 2; (3) page 486 contains an email chain that clearly continues onto the next page, but that page is not included; (4) pages 441-44 include what appears to be half of an excel spreadsheet with columns A, B, and half of column C not included with the document; and (5) while the document at page 572 is unreadable, the redacted portion suggests that it had been readable at some point in the past.

aware of this clearly responsive material.  Thus, Plaintiffs have no way of knowing how many more documents in CBP's production have been unjustifiably redacted.

42.    Because of CBP's ongoing refusal to adequately respond to Plaintiffs' FOIA requests, including its clear attempt to withhold plainly responsive, non-exempt information from the material produced pursuant to Plaintiffs' February 2015 administrative appeal, Plaintiffs have exhausted their administrative remedies and now bring this suit under 5 U.S.C. § 552(a)(4)(B).

**B.    2017 Request**

43.    On March 30, 2017, Plaintiff American Immigration Council submitted another FOIA request to Defendants (the "2017 Request," attached as Exhibit AA).

44.    Like the Translation Request, the 2017 Request seeks documents relating to "the actual, purported, or proposed use of CBP personnel, including U.S. Border Patrol agents, to provide interpretation and/or translation services to other law enforcement agencies."  But the 2017 Request limits itself to documents "prepared, received, transmitted, collected and/or maintained" on or after November 9, 2016.

45.    The 2017 Request also delineates non-exhaustive subcategories of documents, including records from the current administration that are of particular importance to the public. In particular, the 2017 FOIA requests records relating to:

(i)    The implementation of Section 10(b) of President Trump's January 25, 2017 Executive Order entitled "Border Security and Immigration Enforcement Improvements"; and

(ii)    The 20-page memorandum discussing the use of U.S. Border Patrol agents to provide translation assistance to local law enforcement referenced in the *Los Angeles Times* article, "Not just 'bad hombres': Trump is targeting up to 8 million

17

people for deportation," Brian Bennett (Feb. 10, 2017), available at
http://www.latimes.com/politics/la-na-pol-trump-deportations-20170204-
story.html;

46.     By email dated March 30, 2017, CBP acknowledged receipt of the 2017 Request.
(Ex. AB.)   To date, however, Defendants have provided no determination or documents in
response to the 2017 Request.

47.     Because Defendants have failed to respond to the 2017 Request within the
twenty-day statutory time limit, *see* 5 U.S.C. § 552(a)(6)(A)(i), Plaintiffs have exhausted their
administrative remedies and now bring this suit under 5 U.S.C. § 552(a)(4)(B).   *See Nurse v.
Secretary of Air Force*, 231 F.Supp.2d 323, 328 (D.D.C. 2002) (holding that the FOIA
"recognizes a constructive exhaustion doctrine for purposes of judicial review upon the
expiration of certain relevant FOIA deadlines").

## V. Causes of Action

### FIRST CAUSE OF ACTION

**Violation of Freedom of Information Act for Failure to Conduct an Adequate Search for Responsive Records**

48.     Plaintiffs repeat, allege and incorporate the allegations in paragraphs 1-47 as if
fully set forth herein.

49.     Defendants are obligated under 5 U.S.C. § 552(a)(3) to conduct a reasonable
search for records responsive to Plaintiffs' FOIA Requests.  Plaintiffs have a legal right to obtain
such records, and no legal basis exists for Defendants' failure to search for them.

50.     Defendants' failure to conduct a reasonable search for records responsive to
Plaintiffs' requests violates, at a minimum, 5 U.S.C. §(a)(3)(C), as well as the regulations
promulgated thereunder.

## SECOND CAUSE OF ACTION

**Violation of Freedom of Information Act for Failure to Disclose Responsive Records**

51.     Plaintiffs repeat, allege and incorporate the allegations in paragraphs 1-50 as if fully set forth herein.

52.     Defendants are obligated under 5 U.S.C. § 552(a)(3) to produce records responsive to Plaintiffs' FOIA Requests.  Plaintiffs have a legal right to obtain such records, and no legal basis exists for Defendants' failure to disclose them.

53.     Defendants' failure to disclose all responsive records violates, at a minimum, 5 U.S.C. § 552(a)(3)(A), as well as the regulations promulgated thereunder.

## THIRD CAUSE OF ACTION

**Violation of Freedom of Information Act for Failure to Timely Respond**

54.     Plaintiffs repeat, allege and incorporate the allegations in paragraphs 1-53 as if fully set forth herein.

55.     Defendants are obligated under 5 U.S.C. § 552(a)(6) to determine within 20 days whether to comply with a request and immediately notify the requestor.  Defendants are similarly obligated under 5 U.S.C. § 552(a)(6) to make a determination with respect to any appeal within 20 days.  Plaintiffs have a legal right to receive a response within the statutory time periods, and no legal basis exists for Defendants' failure to respond within such time periods.

56.     Defendants' failure to disclose all responsive records violates, at a minimum, 5 U.S.C. § 552(a)(6)(A), as well as the regulations promulgated thereunder.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor against Defendants, and that the Court:

(a)     Declare that Defendants' refusal to conduct a reasonable search for records responsive to Plaintiffs' FOIA Requests violated FOIA;

(b)     Declare that Defendants' refusal to disclose all records responsive to Plaintiffs' FOIA Requests violated FOIA;

(c)     Order Defendants and any of Defendants' departments, components, other organizational structures, agents, or other persons acting by, through, for, or on behalf of Defendants to conduct a reasonable search for records responsive to Plaintiffs' FOIA Requests;

(d)     Enjoin Defendants and any of Defendants' departments, components, other organizational structures, agents, or other persons acting by, through, for, or on behalf of Defendants from improperly withholding records or portions of records responsive to Plaintiffs' 911 Request and Translation Request and order them to promptly produce the same;

(e)     Enjoin Defendants and any of Defendants' departments, components, other organizational structures, agents, or other persons acting by, through, for, or on behalf of Defendants from improperly withholding records or portions of records responsive to Plaintiff American Immigration Council's 2017 Request and order them to promptly produce the same;

(f)     Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 5 U.S.C. § 552(a)(4)(E) and 28 U.S.C. § 2412; and

(g)     Grant all other such relief to Plaintiffs as the Court deems just and equitable.

Dated:   October 17, 2017

By:     /s/ *Melissa Crow*

Melissa Crow, D.D.C. Bar No. 453487
AMERICAN IMMIGRATION COUNCIL
1331 G Street NW, Suite 200
Washington, DC 20005
T: (202) 507-7500
F: (202) 742-5619
mcrow@immcouncil.org


Betty Yang, D.D.C. Bar No. 997328
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Dallas, Texas 75201
T: (214) 698-3226
F: (214) 571-2968
byang@gibsondunn.com


*Attorneys for Plaintiffs*

Of Counsel:

Alexander Mircheff*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
T: (213) 229-7307
F: (213) 229-3197
amircheff@gibsondunn.com

Katie Marquart, D.C. Bar No. 1044618
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
T: (212) 351-4000
F: (212) 351-4035
kmarquart@gibsondunn.com

Joseph Vardner, D.C. Bar No. 1029506
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave NW
Washington, DC 20036
T: (202) 955-8520
F: (202) 350-4236
jvardner@gibsondunn.com

Trina Realmuto*
Kristin Macleod-Ball*
AMERICAN IMMIGRATION COUNCIL
100 Summer Street, 23rd Floor
Boston, MA 02110
T: (857) 305-3600
trealmuto@immcouncil.org
kmacleod-ball@immcouncil.org

Matt Adams*
NORTHWEST IMMIGRANT RIGHTS
PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
T: (206) 957-8611
F: (206) 587-4025
matt@nwirp.org

* moving for *pro hac vice* admission